28

RIGOBERTO PEREIRA ET AL., Plaintiffs, Appellees, and Appellants, *v.* INTERNATIONAL BASIC ECONOMY CORP. and TANA DEVELOPMENT CORP., Defendants, Appellants, and Appellees.

Nos. R-64-26, Decided June 26, 1967.
R-64-30,
C-64-24.

32

*Peñagarícano & Lloveras* for plaintiffs, appellees, and appellants. *Fiddler, González & Rodríguez, Ángel Fiol Négrón,* and *Federico Tilén* for defendants, appellants, and appellees. *Baragaño, Trías, Saldaña & Francis* for the amicus curiae Asociación de Constructores de Hogares de Puerto Rico, Inc.

—O—

*Peñagarícano & Lloveras* for plaintiffs, appellees, and appellants. *Fiddler, González & Rodríguez, Ángel Fiol Negrón,* and *Federico Tilén* for defendants, appellants, and appellees. *Baragaño, Trías, Saldaña & Francis* for the amicus curiae Asociación de Constructores de Hogares de Puerto Rico, Inc.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

A series of fundamental questions related to the activity of housing construction, among others, is raised in these petitions for review. Our decision in that respect shall compliment the doctrine we established in *Géigel* v. *Mariani,* 85 P.R.R. 43 (1962). The principal contentions require that we determine (a) whether it is proper to recover under action *quanti minoris* to which purchasers of buildings are entitled against the vendor, pursuant to §§ 1373, 1374, and 1375 of the Civil Code (31 L.P.R.A. §§ 3841, 3842, and 3843), as well as from the contractor who constructed the buildings in question, pursuant to the provisions of § 1483 of the Civil Code (31 L.P.R.A. § 4124);[1] (b) what is the scope of the "collapse by reason of defects in the construction" which gives rise to the ten-year period action provided by § 1483 of the Civil Code; and (c) whether in addition to the contractor's liability under the above-cited provisions, the contractor is also liable for his negligence in carrying out the construction.

---

[1]Section 1483 of the Civil Code provides:

"The contractor of a building which may have been destroyed by reason of defects in the construction shall be liable for the losses and damages if said building should collapse within ten years, to be counted from the completion of the construction; and during the same time the same liability shall be incurred by the architect who may have directed the work if the collapse is due to defects in the ground or in the direction.

"If the cause should be the noncompliance of the contractor with the conditions of the contract, the action for indemnity may be brought within fifteen years."

—I—

*Nature of the Claims*

Case No. 61-5569 which includes 75 of the plaintiffs-appellees-appellants (hereinafter designated as claimants), was consolidated with cases Nos. 61-8057, 61-8922, 61-8923, 62-1887, 62-2197, 62-3061, 62-3632, and 62-4064, that is, that the total number of claimants is 83, which are the 80 enumerated as such in the judgment of the trial court plus the cases of Rafael Carle Sifre, Germán Sigurany, and Luis Gonzalez Quiñones, which said court omitted from the aforesaid enumeration, but which appear included in the additional findings of fact which, at the request of defendants, said court made. From these, the following acquired their properties from other claimants, after case No. 61-5569 had been filed and were substituted in their place. Robert E. Trent, Luis González Quiñones, Germán Sigurany, José A. Rivera, Ernesto Reyes Arnaldi, José Castellanos Lloréns, Manuel A. Fernández, José Ramón González, and Fernando Barron. The deed of sale in favor of Trent contains a transfer of the vendor's rights in the action initiated by him against defendants. A similar transfer was made in the sale to Sigurany. This was not done in the other cases. The trial judge determined that "in all said cases the original plaintiffs withdrew from the suit and were substituted by their respective purchasers."

In synthesis, the claimants alleged that each one of them bought from defendant-appellant-appellee, Tana Development Corp. (hereinafter designated as Tana), a lot, plus a house built thereon by defendant-appellant-appellee, International Basic Economy Corp. (hereinafter designated as Ibec), for Tana, in the development known as Highland Park, in Río Piedras, Puerto Rico; that in said houses there existed hidden defects in the construction at the time they

were sold to each claimant consisting of defective roofs, detachments, cracks in the walls, defective installation of doors and windows, damaged paint, chipped and faded tiles on floors, defective pipelines and electricity. Specific amounts are claimed to correct the defects plus moving and architecture expenses. By a subsequent amendment, the claimants made it clear that the actions against Tana are *quanti minoris* under §§ 1373 and 1375 of the Civil Code, and by virtue thereof it was alleged that "the reasonable amount of how much less [the claimant] would have paid if he had known at the time of the purchase the conditions of said house is $6,000." Moreover, Ibec was made liable for the damages caused by its fraudulent, malicious, and unfair action, consisting in having experimented with a type of roofing in Highland Park knowing that the experiment was not going to be successful, to the extent that it actually failed, without previously notifying it to each purchaser.

The complaint in Civil Case No. 61-5569 was answered on March 23, 1962. In the answer it was admitted that Ibec was the builder of the houses and Tana the vendor. It is made clear that Ibec constructed for Tana and Tana sold the houses already built together with the lots. The other averments of the complaint were denied for lack of knowledge and it was alleged that Tana and Ibec were deprived of verifying the truth of the averments of the complaint because the claimants objected to their inspecting the houses. In said answer to the complaint, Tana sets forth the following special defenses:

1) The complaint does not state facts, in any of the causes of action, to justify the granting of a remedy in favor of claimants against Tana.

2) Claimants' action *quanti minoris* against Tana was extinguished as to all causes of action because it was brought six months after the houses were delivered.

Ibec set forth and alleged the following special defenses:

1) The complaint does not state, in any of the causes of action, a claim justifying a remedy in favor of claimants against Ibec.

2) No contractual relation exists between claimants and Ibec, it exists only between Tana and Ibec. Neither do claimants have any action against Ibec for damages or on any other account. Any action for defects in the construction would accrue against Tana and the latter did not transfer any personal right to claimants. It only transferred the title of the properties sold.

3) Assuming that claimants would have acquired personal rights belonging to Tana against Ibec, such rights would only be those sanctioned in §§ 1059 and 1060 of the Civil Code (31 L.P.R.A. §§ 3023 and 3024), which do not include among them damages for physical, mental, or emotional sufferings. Such damages, if they do exist, were not nor could have been foreseen when the houses were built. Other damages are improper, uncertain, remote, and speculative.

4) Ibec is not liable to claimants until the latter have exhausted all the remedies they may have against Tana, and have the benefit of levy with regard to the latter's property.

The following were alleged as common special defenses:

1) All the claims have prescribed or are extinguished (31 L.P.R.A. § 3847).

2) Assuming that there are defects the same are of little importance, usual, and easily corrected. The claimants have not permitted that such corrections be made, thus *aggravating* instead of mitigating the damages.

3) Cause of action No. 60 does not lie because it was brought by the administrator of the conjugal partnership.

4) Cause of action No. 66 does not lie because it was not exercised by the owners of the house.

5) Causes of action Nos. 15, 22, 24, 28, 58, 69, 73, and 75 do not lie because they were filed by persons with whom neither Ibec nor Tana have contracted.

6) No. 37 does not lie because Julio A. Machuca Rodríguez, who appears as claimant, is not the owner of the property.

7) Cause No. 61 fails to include Olga Santiago Méndez who is co-owner.

8) Cause of action No. 70 does not lie because the claimant is not the owner of the house.

9) No damages have occurred because the real value of the houses is higher than the price paid for them. That is to say, today the houses have acquired more value.

—II—

*Judgment of the Trial Court*

Judgment was rendered on December 13, 1963, and on January 31, 1964 the trial court, at the request of the parties, supplemented its findings with elaborate additional findings, and by virtue thereof, sustained the complaints except No. 66(a) filed in the name of Julia M. Benítez. It ordered Tana to pay to each one of the claimants *10% of the price* they paid for each house—in the case of ten claimants this amount was fixed at 15% of said price—and ordered Ibec to pay to each claimant in each case:

1) $550 or $650 for a built-up roof, according to the type of the house, "Acapulco" or "Montecarlo", except in two which already have it.

2) $225 to eliminate cardboard used to fill door and window frames and to fix or adjust them more firmly.

3) $200 to repair cracks in walls except in two cases.

4) $750 to correct cracks and stains in the ceiling and to paint the repairs in ceilings and walls.

5) $250 or $325, according to the type of each house, except nine, to repair and change tiles, stained and chipped at the edges.

6) $1,500 for damages caused as a consequence of the vices or defects in construction. The amount was fixed at $2,500 for this concept, in 10 cases.

Both defendants were ordered to pay costs and $300 for attorney's fees for each case, 1/3 by Tana and 2/3 by Ibec.

—III—

*Summary of the Facts*

Seven of the claimants and the spouses of three of them testified, in synthesis, that after they moved they discovered defects in their respective houses consisting of leaks in the roof, through the slabs and joints, detachment of material from the roof, numerous cracks in ceilings and walls, faded tiles on the floor or of different colors, chipped and loose, door and window frames out of plumb and separated from the concrete, and it can be observed that a paperboard used between the frame and the concrete comes out so that light is seen through (witness Partridge testified that in his house the frames and doors were in good condition); that the paint is peeling off; that Ibec tried to repair many of these defects on several occasions but that the leaks and cracks appeared again; that claimants have suffered mental anguish and sufferings, great inconveniences, humiliations when taking their friends to their houses who noticed the aforesaid conditions of the dwellings, and they have even feared for their children's health. Claimant Partridge testified that he inspected the model house which Ibec constructed in the parking lot of the Shopping Center and that he expected that the house he was going to acquire would be like that one. It was stipulated that "each and every one of the remaining claimants and/or their wives would testify likewise. . . ."

Each one of the claimants who were purchasers of dwellings from Tana, first signed a bilateral contract of sale with the latter by virtue of which Tana agreed to deliver to the claimant a lot of a specific area in square meters on which Tana bound itself to build a house in accordance with certain drawings approved by the Federal Housing Administration and the Planning Board, and in conformance with the construction drawings filed with the Bureau of Permits and where it is said that the purchaser examined the drawings of the development and the drawings and specifications of the dwelling. A price was fixed for the property according to the type, Acapulco, that is, the smallest, and Montecarlo, the biggest, subject to the adjustments which might be made in the space of the lot, in case of raise in the wages of the builder, and further, Tana reserved the right of making minor changes and variations in details which in its opinion would make the property more attractive, convenient, comfortable, and for the purpose of giving variety to the development. Finally, the form and manner of conveying the title of the property upon termination of construction and the manner of paying the purchase price in addition to the advance payment was provided for. As part of the operation, in conformance with § 801 of the U.S. Housing Act of 1954, Tana signed in each case, in favor of the purchaser, a warranty that the house has been constructed in substantial conformity with the drawings and specifications (including amendments, changes and variations thereof) approved by the Federal Housing Commissioner, which warranty shall apply to the cases of substantial nonconformity to the drawings and specifications notified to the warrantor within one year from the date of conveyance of title to the purchaser or from the date of termination of the construction or of the initial occupation of the dwelling, whichever occurs first, it being agreed that such warranty shall be in addition to all other rights and privileges which the purchaser may

have under any other law or instrument and shall subsist notwithstanding the provisions to the contrary.

As a result of the inspection made of 48 of the houses in question, the trial judge concluded that:

"14. . . . in all of them there are cracks in the slabs of the roofs, many of those cracks having been corrected in many cases by applying asphalt or other material."

And, further,

"15. That in the ceilings of all the houses there are diverse cracks and of different dimensions, its elimination having been attempted in many cases, without success, leaving as a result thereof spots and stains which extend all along the crack; that in many houses these cracks in the ceiling give the impression that the ceiling is deteriorating; that there are vertical cracks in all the walls but an attempt to repair them only left once more the ugliness of stains; that with [sic] the great majority of the houses we observed that there exist [sic] a reiteration of the horizontal crack between the roof and the walls which extends in many of the houses along the whole of the perimeter thereof; that the juncture or joints of the slabs of the roofs have been treated in such a manner that there is a coat of asphalt all along the joint which raises perceptibly from the current level of the slab for the purpose of holding back the water but that when it rains heavily and the drainage is insufficient, the water accumulated on the roof penetrates the protective asphalt coating, producing leaks in some cases and keeping stagnant water causing an accumulation of moisture and bubbles of water which when pressed with the foot allow the water to flow out; that several of the houses clearly reveal the existence of leaks through the slabs outside the joints; that the paint in many of the houses showed bubbles and scales indicating a detachment or loosening from the surface to which the paint had been adhered; that the tiles of the floor in many of the houses were chipped at the edges and corners and stained with a reddish color as a result of the existence of ferruginous matter in the materials used to make them; that the fronts of the houses had visible cracks at first sight and many of them crossed the wall from one side to the other. That an average prudent calculation indicates that in these houses there were

not less than 25 big cracks and not less than 60 cracks of the so-called 'hair cracks'; that there were defects in the closets and in some houses the joint which went across the closets had damaged them with the leaks; that the door and window frames in many houses were out of plumb, and the holes between the concrete or door or window frame which had been originally filled with cardboard and covered in the exterior with a coating material, as a result of the swinging of the doors or of the action of the rain and wind, the coating material had fallen off allowing the water to penetrate and when the cardboard became wet it puffed up and became detached leaving spaces through which the light from the exterior passed into the room; that there were a lot of tiles which sound hollow to percussion, revealing that they are not solid enough, which fact caused, with its use, the detachment of the tile.

"The parties having stipulated that the inspection of the rest of the houses of the other claimants reveal an average situation as compared to that of the houses subject to the inspection, we infer that in the houses not inspected the same findings hereinbefore set forth exist."

The record shows that it was part of this stipulation that "in case any compensation would be appropriate, then, for the other houses not visited, the court would determine such compensation on the basis of an average of the houses already visited."

"23. That the slabs of the roofs of these houses were reinforced by a wire-mesh, two-eighths in diameter placed at the lower part of the slab very close to its interior surface supported by the foam-concrete of the roof.

"24. That the wire-mesh used as reinforcement in the slabs of the roofs of plaintiffs' houses had a six-inch wire spacing and experts recommend for reinforcing slabs one and a half inches thick like the ones used in the roofs of the houses of Highland Park, a wire-mesh of two-inch wire spacing.

"25. That the sudden changes in temperature which cause a sudden cooling of a roof slab exposed to hot sun as a result of unexpected shower produce cracks like those which appeared in the roofs of plaintiffs' houses and contributes to their enlargement according to the frequency of the phenomenon."

"31. That defendants did not inform plaintiffs as to the type of roof they were going to build for all the houses bought by plaintiffs."

"37. That the incidence of leaks in the roofs of these houses at the joints of the slabs is about two-thirds to one-third at other places.

"38. That the built-up roof is a system of protecting roofs against leaks and its average efficiency guarantee is only ten years."

"42. That plaintiffs [*sic*] had doubts that the roofs would leak more with the use of thoroseal than if Alumination had been used and therefore they changed to this last material, although they always had reasonable doubt that the roofs would always leak."

"49. That the system of foam-concrete and precast slabs for the roofs was used by the defendants for the first time in the model house and water leaked but nothing in that respect was informed to plaintiffs."

"13. That the door and window frames of the houses of this litigation were placed in the concrete frame of the wall filling the spaces between the opening in the wall and the frame with cardboard which upon coming in contact with the water, because of the loosening of the small quantity of putty, concrete or paint with which said fillers were treated, became wet and expanded coming out in some places and finally producing in many of the houses interstices through which the light passed."

"35. That the frames used to fix the doors in plaintiffs' houses were concave and were attached to expansions which were fastened to the concrete with too short nails, for which reason they were not firmly fixed in the opening of the concrete and with the swinging of the doors they were loosened in a visible manner."

"16. That the drawings and specifications that would govern the construction of the houses purchased by plaintiffs were approved by the Federal Housing Administration and the Puerto Rico Planning Board.

"17. That the construction works of the houses at Highland Park Development were supervised and inspected by representatives of the Federal Housing Administration and of the

Puerto Rico Planning Board and finally they approved the same for the occupancy of the original purchasers."

"41. That defendants introduced some alterations to the drawings of the houses as it was revealed from the copies of said drawings submitted to the F.H.A. and to the Planning Board, which alterations were notified to the F.H.A. but all of them were not notified to the Planning Board nor to plaintiffs personally."

"21. That defendants, once they were informed of the deficiencies of the several houses sold to plaintiffs, carried out the repairs of the defects reported by plaintiffs in many of their houses taking personnel to repair the houses in many occasions for more than four or six times.

"22. That the defects reported to defendants and especially the cracks in the ceilings and walls, although they were treated and corrected by the defendants, they were reproduced and became more numerous."

"52. That Pedro Silva was maintenance foreman and he had a number of men under his charge for the maintenance of the houses which was increased in proportion as the houses were being delivered to the purchasers."

In his findings of fact, the trial judge continues stating the following:

"Pedro Silva tells us that there was a small house-office with a girl who received the complaints and reports of the deficiencies discovered in the houses of the plaintiffs themselves and wrote them down to be attended to later. That witness testified that the repairs which were commenced in the houses were not successful and another method was adopted in order to correct them. Engineer Muratti [Tana-Ibec's expert] testified that in the houses he inspected he saw cracks in the walls, in the roofs, in the ceilings of all the houses, the 51 he inspected; that he saw cleavage-cracks and fracture-cracks in all the houses and that the asphalt put in the joints was not well put; that the doors of these houses are too big and constitute a defect of construction; that the stains in the walls as a result of the correction of the cracks in them are detrimental to the appearance; that the leaks through the slabs and joints are defects of construction; that if the need to repair exists, the defect is of construction; that the house of Julio Pietrantoni Vélez shows

a defect in construction because since the wall did not reach the level of the roof they had to fill the space in order to reach the roof; that the house of Rigoberto Pereira was not well built, but that according to modern construction it is necessary to accept defects of construction because of lack of skill in modern labor; that appearance is an important factor and that in the house of Julio Pietrantoni Vélez there is the maximum grade of defects; that the houses with defects are disagreeable; this same expert Muratti testified that there are two ways for correcting the ceiling: (1st) using styrofoam and (2d) using epoxy resin. Muratti says that the ceiling's paint would cost fifty dollars ($50) on the inside and twenty-five dollars ($25) to paint the eaves on the outside. Muratti testifies that foam-concrete absorbs water at the rate of 2.52% per cubic foot, and ordinary concrete consumes at the rate of .05%, that is, 2-1/2 times less than foam-concrete.

"Engineer Padilla [Tana-Ibec's expert], who inspected all the houses of this case in order to give his opinion as to the cost of repairing the defects, testified that some of the doors built in these houses are uncommon and that a strong breeze produces cross ventilation and knocking of doors which cause the loosening of the frames and the falling of the putty of the cracks between the frames and the concrete. Padilla also states that the doors have no jamb and that if they had it they would be more solid; that the knocking of the doors cause the openings of cracks and that he would use cardboard to fill the opening between the frames and the concrete as a last resort, and that he would rather use a firmer putty. Witness Ángel J. Samaritano [Tana-Ibec's expert] testified that he saw the Alumination in the roofs of the houses of Highland Park and that it is not permanent in this kind of roofing or construction; that Alumination lasts from six months to three years. Samaritano recommends the use of epoxy resin as a temporary measure because those are new methods and he does not offer his opinion as to their use. Padilla testified also upon seeing photographs of the house of Julio Pietrantoni Vélez that it would be necessary to demolish nearly all the wall in question."

With respect to the nature of the defects observed by the trial judge, he stated in the judgment of these cases that:

". . . The defects of construction taken as a whole present a picture of painful reality for the plaintiffs who expected to have a house like the model showed to them. Plaintiffs suffered the frustration of a person who expects to attain relative comfort after making the sacrifice of purchasing a house in which to live and then is disturbed with the uncertainty of its solidity and duration and that he must be alert at night-time when bad weather strikes in order to prevent his children from suffering the inconveniences of the leaks and to protect his furniture and clothes against the destructive action of the inclemency of the weather."

As to the collapse contemplated by § 1483 of the Civil Code the trial court decided that:

"It is true that the plaintiffs are occupying all of their houses. In order to do that they assumed the obligation to pay for them in long-term instalments. But because they have to use them can it be said that they are enjoying them in full? There is no doubt that up to the present time the houses have not become unfit for their use as residences but there is no doubt either that the defects of construction have seriously limited that same use, in such a manner that the plaintiffs are not satisfied with the purchase of their houses. The use or enjoyment of the thing contemplated by § 1373 of the Civil Code is not only the material use but also the use or enjoyment thereof in the spiritual enjoyment of life in the midst of the community.
". . . . . . . .

"The collapse contemplated by § 1483 of the Civil Code is not the total destruction of a certain structure, it is rather that state of solidity perceptibly diminished and in the process of increasing the deficiencies in unusual construction. In the general panorama, plaintiffs' houses if they are not adequately repaired and protected from such vices in construction, the structural ruin thereof would, within a short time, become a reality."

Respecting the action against Ibec, the judgment in question provides that:

". . . Nothing was contracted between plaintiffs and Ibec but after they became owners of the houses constructed by

Ibec by virtue of purchase made directly from Tana or its assignees, original purchasers, and having brought their action within the term prescribed by law there can be no doubt that their action is an action against Ibec by reason of the latter's fault in constructing the houses with the vices in construction revealed by the evidence. Ibec's liability is not limited to the case wherein the vice in construction caused the total ruin of the thing built. Ibec is also liable for the partial ruin in these cases. Its obligation to compensate for the vices in construction is extended in favor of any owner who acquires one of these houses, if he filed his claim within the term fixed by law. Defendants maintain that plaintiffs are using their houses, all their dependencies, without any limitation. The first is true, but not the second which is not supported by the evidence. The evidence shows that plaintiffs have become deeply preoccupied with the security of their children; that at nighttime they have had to arise in order to protect their children and property from the action of the weather causing leaks and that they have had to refrain at times from social communication with relatives and friends to keep their houses from being seen with the cracks and resulting stains."

As questions of law the trial court concluded:

"6. That the vices or defects in construction which existed in plaintiffs' houses, as revealed from the evidence, are vices or defects which exceed the measure of imperfections which might be expected in a concrete construction."

"8. That defendant Ibec, although it is true that it acted negligently upon continuing the construction of the houses of this suit using precast roofs knowing that their use constituted a risk because it was an experiment which would not be successful in view of the results obtained in the model house, did not act deceitfully or fraudulently in the construction of the houses of Highland Park Development.

"9. That it having been established by the evidence that vices or defects in construction which exceed the measure of the imperfections which might be expected in a concrete construction existed in each and every one of the houses involved in this action against Ibec for violation of the provisions of § 1483 of the Civil Code, contractor Ibec as builder of the houses is bound to remedy its fault for negligence, for the future, by

restoring all the qualities of a good construction to each one of plaintiffs' houses and the court may order it to pay the cost of such restoration."

The parties feeling aggrieved by the decision in question, at the request of Tana and Ibec and of claimants, we issued writ of review Nos. R-64-26 and R-64-30 and writ of certiorari C-64-24, the latter concerning the award of certain costs and expenses of claimants. At the request of Home Builders Association of Puerto Rico, we granted leave to appear as amicus curiae. We shall discuss hereinafter the different errors assigned by the parties in each one of the aforesaid three appeals in the same order in which we have mentioned them above.

—A—

*Errors assigned by Tana-Ibec and
discussed by the Amicus Curiae
Review R-64-26*

1—There is no need to consider appellants' assignments concerning the judgment rendered against Tana since we concluded that Ibec and Tana constitute a single entity.

We conclude thus on the ground that not only appellants and the amicus curiae admitted that Tana and Ibec constituted a single entity, but also, the trial court concluded that ". . . Tana and Ibec are corporations closely interrelated with identity of interests, Tana being, for all purposes, a subsidiary of Ibec and the Board of Directors of each one of them being composed of practically the same officials." *San Miguel Fertilizer Corp.* v. *P.R. Drydock,* 94 P.R.R. 403 (1967); *J. E. Candal & Co.* v. *Rivera,* 86 P.R.R. 481 (1962). See also, *Licorería Trigo, Inc.* v. *Secretary of the Treasury,* 94 P.R.R. 257 (1967); *South Porto Rico Sugar Corporation* v. *Sugar Board,* 88 P.R.R. 42 (1963).

Moreover, as appellants indicate, claimants cannot recover both from Tana and from Ibec for the same damages, that is, for the vices in construction in the houses which Ibec constructed and sold to claimants through Tana. We shall refer hereinafter to appellants as a single entity designated Tana-Ibec.

2—Tana-Ibec assigns that "the judgment is erroneous inasmuch as it sustains the complaints against Ibec in the consolidated cases and orders it to pay to plaintiffs damages on the ground of the alleged ruin of the houses in Highland Park Development." The amicus curiae adds that Tana-Ibec's liability, as builder of said dwellings, with respect to the defects in question, is that of the vendor of said properties; that the trial court erred in concluding that the imperfections challenged constitute vices in construction and in finding the contractor liable for visible vices in the works evident at the time of delivery.

In support of this assignment Tana-Ibec informs that the claims against Ibec and the judgment appealed from are based on § 1483 of the Civil Code (31 L.P.R.A. § 4124);[2] that the action against Ibec is ex contractu and not ex delicto, for it is contained within the provisions of the Civil Code

---

[2] It is interesting to note that liability for defects in construction is very old. Four thousand years ago the Hammurabi Code provided the following on that particular:

"229. If an architect has constructed a house for someone and has not built it solidly, if the house collapses and kills the proprietor, this architect deserves death."

"230. If it kills the proprietor's son, the architect's son shall be killed."

"231. If it kills a proprietor's slave, the architect shall deliver slave for slave to the proprietor."

"232. If it ruins his wealth, everything lost must be compensated, and for not having solidly constructed the house which he built and which has collapsed, he [the architect] must build the house again at his expense." See the translation into Spanish of said Code by Professor Gabriel Franco, published in the *Revista de Ciencias Sociales de la Universidad de Puerto Rico* 331 *et seq.* (1962).

with respect to the lease of works and services; that the action prescribed by § 1809 of the aforesaid Code, against the architect or builder (31 L.P.R.A. § 5148)[3] corresponds to a third person not connected either by himself or through from whomever he acquires by a contractual relation with the architect or contractor which is not the situation involved herein; that the houses have not been totally or partially destroyed, pursuant to the decision in *Géigel* v. *Mariani, supra*; that the existence of "vices in construction" was not established; that there was no violation of the construction contract, and that the government agencies in charge of the inspection and supervision of the works approved the constructions.

The trial judge concluded that "the vices or defects in construction which existed in plaintiffs' houses, as revealed from the evidence, are vices or defects which exceed the measure of the imperfections usually expected in a concrete construction work," measure which we established in *Géigel, supra*. The evidence, particularly the additional findings of fact of the trial judge as a result of his inspection, showed that claimants' dwellings had so many roof leaks, such multiplicity of cracks and detachments from the roofs, ceilings, and walls, and such defects in doors and windows, that we must conclude that as a whole they fall within the definition of vices or defects in construction previously indicated.

We stated in *Géigel, supra*, that the builder's liability for such vices in construction is not limited to the total ruin of the thing built but that he is also liable for partial ruin. In said case we concluded that large, serious and continuous leaks in a concrete roof or platform which

---

[3] Section 1809 of the Civil Code reads as follows:

"Should the damages referred to in the two preceding sections arise from defects in construction, the third person who suffers it may only claim damages of the architect, or, in a proper case, of the constructor, within the legal period."

have ruined the ceilings of the house and the paint on its walls establish the ruinous condition to which § 1483 refers. In the instant case, the ruinous condition of many of the houses was even more patent since it consisted not only of leaks but of other vices, previously related, all of which were hidden vices or defects as required, according to what we said in *González* v. *Agostini*, 79 P.R.R. 481 (1956), except the defects in the tiles of the floor.

■ As to the defects which do not constitute the hidden vices in construction to which § 1483 refers, the evidence is clear to the effect that Tana-Ibec agreed to repair them; that it attempted to comply with this obligation on several occasions but unsuccessfully, for which reason it is still bound by that obligation.

■ We cannot agree with the amicus curiae in that the builder's liability in this case is that of a vendor because it furnished materials and labor as respects the construction of dwellings for sale and since there existed a real situation of identity between Tana and Ibec, it provided also the lots where the buildings were constructed; that in effect it is a builder-vendor. We agree with Professor Velázquez when he says with respect thereto:

". . . This reasoning must be rejected, in view of the fact that it does not take into consideration the fact that the contractor, upon carrying out a construction, is under the obligation of exercising the care and precautions which at law should be expected from him by reason of his profession. And as it is precisely on this idea, to which considerations of public interest are connected, that the provisions of § 1483 rely, it would be contrary to its spirit to limit its application to the case in which the contractor has constructed on land furnished by the proprietor." Velázquez, *Responsabilidad por los Defectos en las Edificaciones*, 20 *Rev. Jur. U.P.R.* 13, 26.

3—"The judgment is additional and especially erroneous inasmuch as it concludes that appellant Ibec was negligent in the

construction of the houses of the project 'Highland Park' in using the precast type of roof."

■ We do not doubt that Tana-Ibec was negligent in the construction of the houses in question. The following circumstances justify this finding:

a) the precast roof together with an inferior layer of foam-concrete had not been used prior thereto in Puerto Rico in the mass production of a great number of dwellings so that they did not have sufficient experience in this type of construction. The result was that because of lack of experience or of care there were considerable leaks through many slabs and more through the joints between them and innumerable cracks in the roofs, ceilings, and walls. There was evidence that these cracks were due to different causes. Expert Martín testified that those of the roofs were due in part to the handling stress at the time of setting the precast slabs in their place. Those in the joints were due to movements of one slab in relation to other. Expert Muratti testified that "these small imperfections . . . have occurred either as a result of the concrete pouring or as a result of the operation in taking these precast roofs and placing them on the houses . . ."; those of the ceilings were due to the difference in material that exists between the standard concrete of the joists and the foam-concrete used between them and that they were set jointly in the precasting process. Other cracks in the walls, near the joint between the wall and the roof, were due to the stresses caused by the precast slabs and in their handling.

Expert Amerikian testified that it is normal for 5% of the constructed roofs to leak. Expert Muratti testified that from 51 houses he examined, nine of them showed signs of roof leaks, that is to say, 17.65%. In other words, according to this testimony the incidence of leaks through the roof is much greater than what is usually to be expected.

b) The defective installation of the door and window frames and the defective design of doors do not show for certain that the construction was carried out with the proper zeal, care, and skill usually to be expected in any common construction.

c) The fact that a great number of tiles on the floors are broken at the edges or loose and others are faded shows that the builder did not exercise due care in buying tiles of an acceptable quality or purchased them from an irresponsible manufacturer, or in the case of the ones which appear broken or loose, did not exercise due care in placing them.

d) The houses had many other imperfections. Apparently claims were not filed for these imperfections because Tana-Ibec corrected them prior to the complaints in these cases.

e). The court concluded, on the evidence presented, that the spacing of the wire-mesh used as reinforcement in the slabs of the roofs of the aforesaid houses was three times greater than the spacing recommended by the experts.

f) The precast roofs were first used in the model house. It leaked water through the roof, but nevertheless, the same type of roof was used in the construction of the houses without informing it to claimants.

g) According to one of Tana-Ibec's experts tests of the concrete were not made according to prescribed practices and standards.

4—It is alleged that it was inappropriate to order Tana-Ibec to pay to each owner of the houses of the Acapulco type the amount of $550 and to each owner of the Montecarlo houses the amount of $650 for the installation of a built-up roof because the evidence established that only a little more than half of the houses needed additional protection in their roofs. It is not so. The evidence as to this defect might have been to a certain extent conflicting but from the examination of the evidence as a whole it is evident that there was ground to support the trial court's finding as to this particular.

■■ It is alleged that the amounts of the other items of cost of repairs are excessive and they are not supported by or based on the evidence of expert witnesses qualified to testify as to the cost of repairs in Puerto Rico; that a great number of houses were in excellent condition. Before going further, it is necessary to stress that (a) the trial court may make its own estimate of said cost since the intervention of experts does not constitute a judgment "but only an opinion," 23 Scaevola, *Código Civil* 625, 1906 ed.; *cf. Concepción Guzmán* v. *W.R.A.*, 92 P.R.R. 473 (1965); and (b) the trial judge personally inspected 48 houses and it was stipulated that the rest of them reveal an average situation as compared to the one revealed in the inspection.

The cost items of the repairs referred to in the preceding paragraph are not excessive and are based on the evidence presented. The item as to the elimination of the cardboard and the fixing or firmer adjustment of door and window frames is a little more than half the estimate of expert Martín; the item for the floors is a little more than a third of the estimate of said expert; while the ones for cracks in walls and to correct and eliminate cracks and stains in the ceiling and to paint the repairs in ceilings and walls is only a bit lower than the estimate of this expert.

To the list of the houses of the claimants enumerated in subsection (5) of the trial court's judgment, which do not need repairs and change of tiles, those of Milton Heath, Leonard Partridge, and Dr. Salvador Hernández Oviedo should be added, because, as Tana-Ibec indicates, it was thus determined by said court in its additional findings of fact.

5—It is assigned as an error committed by the trial court that Tana-Ibec was ordered to pay $1,500 to some claimants and $2,500 to others for damages as a consequence of the vices or defects in construction in their respective properties.

It is argued that the aforesaid awards are improper for punitive damages as well as for mental sufferings; that in Puerto Rico the award of punitive damages[4] has not been authorized by law, and therefore, to award them is improper; that in actions based on, or derived from a contractual relation or breach of contract the award of damages for mental anguish and sufferings does not lie. The amicus curiae in its fifth and ninth paragraphs insists that the award for moral damages against Tana-Ibec is improper because the compensation in *quanti minoris* already includes in the reduction of the price all compensation for damages to which the purchaser is entitled and therefore he cannot recover against the contractor for there are no more damages to recover and, further, under §§ 1054, 1056, and 1057 of the Civil Code (31 L.P.R.A. §§ 3018, 3020, and 3021) such damages cannot be recovered from Tana-Ibec since no contractual relation existed between the latter and claimants.

■ We need not decide on this occasion whether punitive damages are proper in cases like these, for it is evident from the findings of the trial judge that the item of $1,500 in some cases and $2,500 in other cases were awarded for moral damages.

The examination of the evidence we have made convinces us that the trial judge had ample justification to conclude that claimants suffered moral damages. It is obvious that families of limited income who acquire houses of new construction, with the great illusion of being able to acquire

---

[4] Professor Velázquez says that "the Puerto Rican case law has not yet admitted the doctrine of *punitive damages* sanctioned by Anglo-American Law . . . . It seems that in Anglo-American Law, where moral damages are not admitted, said doctrine is justified. A like justification does not exist in Puerto Rican Law." (Italics in the original.) Velázquez, *Las Obligaciones según el Derecho Puertorriqueño* 120 (Equity 1964 ed.). See also, Hernández Usera, *Miguel* v. *Hernaíz Targa y La Concesión de Daños Punitivos en Puerto Rico*, 4 *Revista de Derecho, Legislación y Jurisprudencia* 106 (1939–1940).

their own houses constructed in a certain architectural style and attractively finished as they could gather from examining the model house, would feel frustrated and humiliated, distraught with worries and anguish, fearing for the instability of the construction and for the health of their children, and suffer many substantial inconveniences (as it was admitted in several of the circular letters addressed to claimants by one of Tana-Ibec's executives) because of the distressing picture represented by the defects in their houses which we have previously described.

■ It is alleged, however that such damages are not recoverable from Tana-Ibec. We believe they are. We have shown before that claimants' houses have the aforementioned defects and that Tana-Ibec as the builder thereof is liable for the damages which it might cause. It is alleged that the contractor's liability under § 1483 of the Civil Code does not include the moral damages for three reasons, to wit:

a) such liability is limited to the repairs of the defects or to the payment of a compensation which is measured by the cost of repairs plus the supplementary expenses which might have been caused to the prejudiced party;

b) such contractor's liability arises from a contractual relation and since such relation did not exist between Ibec and claimants the claim for such damages under §§ 1054, 1056, 1057, 1059, and 1060 of the Civil Code (31 L.P.R.A. §§ 3018, 3020, 3021, 3023, and 3024)[5] is inappropriate;

---

[5] Sections 1054, 1056, 1057, 1059, and 1060 of the Civil Code provide the following:

*Section 1054.*

"Those who in fulfilling their obligations are guilty of fraud, negligence, or delay, and those who in any manner whatsoever act in contravention of the stipulations of the same, shall be subject to indemnify for the losses and damages caused thereby."

*Section 1056.*

"Liability arising from negligence is also demandable in the fulfilment of all kinds of obligations; but it may be mitigated by the court, according to the case."

c) that in case the liability arises from a contractual relation it does not include moral damages.

It is true that in *Soegard v. Concretera Nacional, Inc.*, 88 P.R.R. 174 (1963) we held "that generally, mental and moral damages based on a breach of contract or in the destruction or loss of property are not compensable" because they cannot be foreseen. However in *Conjugal Partnership v. Water Resources Authority*, 91 P.R.R. 72 (1964) we held that "the judgment ordering appellant to pay damages suffered [sufferings and mental anguish] by plaintiffs as a result of the delay in the fulfillment of its obligation is not erroneous." Said obligation was of a contractual nature. In *Camacho v. Catholic Church*, 72 P.R.R. 332 (1951), we held that damages for mental sufferings for violation of sepulchre as a result of the breach of a contract of sale of a vault in a cemetery are compensable because they could be foreseen since "they are clearly a necessary consequence of the breach of contract." In *Díaz v. Palmer*, 62 P.R.R. 106 (1943), we held that an item for damages due to sufferings and mental anguish caused by the destruction—by fire—of a

---

*Section 1057.*

"The fault or negligence of the debtor consists of the omission of the steps which may be required by the character of the obligation, and which may pertain to the circumstances of the persons, time, and place.

"Should the obligation not state what conduct is to be observed in its fulfilment, that observed by a good father of a family shall be required."

*Section 1059.*

"Indemnity for losses and damages includes not only the amount of the loss which may have been suffered, but also that of the profit which the creditor may have failed to realize, reserving the provisions contained in the following sections."

*Section 1060.*

"The losses and damages for which a debtor in good faith is liable, are those foreseen or which may have been foreseen, at the time of constituting the obligation, and which may be a necessary consequence of its nonfulfilment.

"In case of fraud, the debtor shall be liable for all those which clearly may originate from the nonfulfilment of the obligation."

frame house belonging to plaintiff was not compensable. But in this case it was a question of a locked house, not occupied by its owner who was the claimant of such damages. On the contrary in the case at bar the claimants, with the exception of Robert E. Trent, Luis González Quiñones, Germán Sigurany, José A. Rivera, Ernesto Reyes Arnaldi, José Castellano Lloréns, Manuel A. Fernández, José Ramón González, and Fernando Barron endured the sufferings and mental anguish directly as a result of the defects in construction while they lived in their respective and recently acquired houses. In the case of the claimants we have just enumerated, the moral damages were suffered by the purchasers of Tana-Ibec who later sold their properties to these claimants who were substituted in the causes under consideration instead of the original purchasers. As to the propriety of the latter's claims, see our discussion and findings in paragraph A-7 of this opinion. The multiple defects in the houses was undoubtedly the direct cause of such damages. We believe that under the facts of these cases, it could be foreseen that the negligent construction of the houses would cause mental anguish and sufferings to the families who purchased them from Tana-Ibec. They expected, as they were entitled to expect, that the houses had been constructed according to acceptable practices of engineering and of the same quality of the model house shown to them, in addition to the fact that the construction would have been carried out substantially in accordance with the drawings and specifications approved. Therefore, if liability under § 1483 arises from a contractual relation, the contractor is liable, under the circumstances of this case, for the moral damages caused by its negligence in the fulfilment of its obligation to construct such houses.

In regard to the award of moral damages resulting from nonperformance of obligations, Castán tells us that:

"But there are authorities on civil law who believe—correctly, in our opinion—that the moral damages having been

admitted as susceptible of compensation in extracontractual field, there is no reason for its exclusion from the field of contractual obligations.

"Actually, the arguments which are generally invoked against compensation for moral damages may affect likewise contractual and extracontractual fault, and are, nearly always, rather than of essence, of a technical and systematic nature. The discussion centers greatly on whether the material damage and the moral damage constitute one concept only or two different concepts; it should be understood, in the last sense, as for example according to Pacchioni's view, that 'only the patrimonial damage can be *recovered,* while nonpatrimonial moral damages are not recoverable but only in some way *compensable.*' [Italics in the original.] Without giving much importance to the debate in this conceptual plan, *we can reach the following conclusions: 1st. That reparation or compensation for moral damages is equitable whether it can be framed within the legal rules of compensation for damages or, whether it falls, insofar as the latter is not applicable, within the general principles of law.* [Italics ours.] 2d. That, in any event, it seems doubtless that the compensation for moral damages which do not result in immediate material loss must be submitted to a juridical order different from that governing damages properly patrimonial: the requirements affecting the causal nexus and the evidence of the moral damages must be treated with less rigor than when material damages are involved, and an ample discretion should be granted to the courts for weighing them." III Castán, *Derecho Civil Español, Común y Foral, Derecho de Obligaciones* 177–179, 9th ed. (1958).

Jaime Santos Briz in his work, *Derecho de Daños* 120–125 (1963); and Lino Rodríguez Arias in his, *Derecho de Obligaciones* 243 (1965), share that view. See also, Borrell y Soler, *Cumplimiento, Incumplimiento y Extinción de las Obligaciones Contractuales Civiles* 117–120 (1954), and Borrell y Soler, 3 *Derecho Civil Español* 64 (1955); 2, Part 1 Planiol and Ripert, Treatise on the Civil Law 152–153, 11th ed. (1939), translated by the Louisiana State Law Institute; Josserand, II-I *Derecho Civil* 508–509 (1950); Spota, I-2 *Tratado de Derecho Civil* 221–222 (1950).

■ It is argued that recoverable damages under § 1483 are limited to those indicated in the foregoing paragraph (a). We find nothing at law that requires the conclusion that in their claim against Tana-Ibec, the claimants are limited to the remedy provided by § 1483. In the complaints in these cases it was alleged that claimants suffered damages and mental and emotional sufferings upon seeing their residences in a ruinous condition. The evidence produced showed the scope of such damages and that the legal cause thereof was Tana-Ibec's negligence. Therefore, in view of the foregoing and of the provisions of Rules Nos. 6.6 and 13.2 of the Rules of Civil Procedure,[6] we hold that Tana-Ibec is liable for the moral damages, foreseeable as previously stated, suffered by the claimants who originally purchased the houses from Tana-Ibec, as well as for the material damages consisting of the determined cost of repairing the vices or defects in construction in each one of the houses purchased by claimants.

■ 6—Moreover, the judgment appealed from is erroneous in regard to Tana-Ibec since it did not consider, in order to reduce the amount of the recovery, the fact that said

---

[6] The aforesaid Rules 6.6 and 13.2 provide that:
*Rule 6.6*
"All pleadings shall be so construed as to do substantial justice."
*Rule 13.2*
"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice his action or defense. The court may grant a continuance to enable the objecting party to meet such evidence." See *Castillo* v. *Padró*, judgment of October 9, 1963, Certiorari No. CE-63-33.

claimants and the persons from whom some of them acquired the houses, have done nothing either prior to or after the commencement of the consolidated suits to deter the condition of the houses from becoming worse; first by rejecting the offers made by Tana-Ibec of making the necessary repairs and, second, by not carrying them out by themselves.

Tana-Ibec argues that on repeated occasions it offered claimants to make the necessary permanent repairs in their houses, which fact was established according to finding of fact No. 40 of the judgment of the trial court; that the claimants admitted it according to claimant Partridge; and that they rejected the offer and did not carry out such repairs on their own, according to the testimony of claimant Ruby; that assuming that they did not want Tana-Ibec to carry them out because it had formerly attempted to and did not succeed as it was determined by the trial judge in his finding of fact No. 22, the claimants should have carried out the repairs on their own; that it cannot be argued that they were not in condition to do so, since the evidence showed that some of the claimants made important additions to their houses, among them claimant Oscar Padró Collado who enlarged his house; that what has been stated with respect to the three claimants we have just mentioned covers the others by stipulation of the parties; that if Tana-Ibec is liable under the facts in these cases, said liability should be limited to the condition existing at the time the houses were delivered and that it should not be liable for greater or additional damages caused by the claimants' own negligence; that there was ground in the evidence to limit the liability for (a) engineer Vivoni testified that if the repairs had been timely carried out they would have cost 30% of its cost at the time of his testimony and (b) claimants' witness, engineer Martín, testified that the cost of materials increased 4% from the time he examined the houses in May 1962 to the time of his testimony and that it would continue increas-

ing and that said costs had increased even more at the time of the inspection carried out by the trial judge on the basis of which he made his determination of the amounts for which Tana-Ibec was liable; that in addition to the increase in cost, the importance and seriousness of the alleged defects were also increasing. In *Géigel* v. *Mariani, supra,* we cited the case of *Limjap* v. *J. Machuca & Co.,* 38 Phil. Rep. 451, 455 (1918), where it is said that it is the duty of the contracting party injured by defects in a building to exercise reasonable care and diligence to avoid loss and minimize the resulting damage. See, also, *Franceschi* v. *Rivera Echevarría,* 94 P.R.R. 558 (1967); *Díaz, etc.* v. *Quetglas y Acevedo,* judgment of February 28, 1964; *Stella, now his Heirs* v. *Municipality,* 76 P.R.R. 733, 745 (1954); *Palmer* v. *Barreras,* 73 P.R.R. 266, 272–273 (1952); *Ortiz* v. *McCormick Steamship Co.,* 57 P.R.R. 551, 557 (1940); *López* v. *American Railroad Co. of P.R.,* 50 P.R.R. 1, 28 (1936).

The record shows that from the time the claimants occupied their respective houses, Tana-Ibec was carrying out repairs in them, effective in the case of some defects and unsuccessful in the case of others, until the claimants were convinced of the ineffectiveness of such measures and did not permit them any more. No evidence was introduced that the claimants were economically able to carry out the repairs in question. Oscar Padró Collado only admitted that he had constructed an additional room. This claimant as well as others, testified that they did not make the repairs in question because Tana-Ibec had attempted to make them and the cracks as well as the leaks appeared again for which reason they believed that the leaks and cracks could not be corrected except by the total removal of the roof and the construction of another as it was recommended and testified by expert Martín in his direct testimony.

It is evident from the record that Tana-Ibec's evidence on which this assignment of error is based is scanty, vague,

inaccurate, and speculative and that, on the contrary, the claimants did not have well-founded reasons for not taking immediate measures to correct the defects or to prevent their aggravation, if they were indeed aggravated, for such situation was not shown by, nor can it be inferred with relative certainty from the evidence adduced to that effect.

7—"The judgment is supplementary and especially erroneous as to both appellants Tana and Ibec in sustaining the claims of the following plaintiffs, Robert E. Trent, Luis González Quiñones, Germán Sigurany, José A. Rivera, Ernesto Reyes Arnaldi, José Castellano Lloréns, Manuel A. Hernández, José Ramón González, and Fernando Barron."

The claimants in question acquired their houses after the litigation brought by the original purchasers was pending. In the case of two of the aforesaid nine second purchasers, claimants herein, the transfer of the corresponding cause of action was stated in their deeds of sale. In all these cases a motion was filed to substitute the second purchaser for the original purchaser, and notice thereof was served on Tana-Ibec, pursuant to the provisions of Rule 22.3 of the Rules of Civil Procedure.[7] The order of the trial court authorizing the substitution was not objected to by Tana-Ibec. Moreover, the latter signed, on January 20, 1964, a stipulation relating the names of the aforesaid nine subsequent purchasers.

It is argued that for these transferees the defects in question were not hidden when they received the houses; that the action for warranty of the aforesaid transferees is against the persons who sold to them; that if said action accrued against the first vendor in this case, it had prescribed because the period of six months for filing it had

[7] Rule 22.3 provides:

"In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. Service of the motion shall be made as provided in Rule 22.1."

already expired; that the action does not lie under § 1483 against Tana-Ibec in these cases because if the houses were ruined, the ruin did not occur after the new purchasers were in possession of their respective houses; that upon acquiring their houses, they only acquired the title thereto with all the inherent rights as owners of the same, but they did not acquire the personal rights of the former owners in the absence of a specific stipulation to that respect, the action of the former owners being of a personal nature not transferable such as the claim for damages and mental anguish; that the foregoing holds true also for the cases of the transferees Robert Trent and Germán Sigurany, since the transfer of the pending action stipulated in their deeds of sale does not state the price or consideration of the transfer for which reason Tana-Ibec is being deprived of its right to extinguish the litigious credit by reimbursing the price paid for it, as provided by § 1425 of the Civil Code (31 L.P.R.A. § 3950).

 Section 1065 of the Civil Code (31 L.P.R.A. § 3029), provides that "All the rights acquired by virtue of an obligation are transmissible, subject to law, should there be no stipulation to the contrary." There is no agreement between the parties limiting the transfer of the rights of the original purchasers in these cases. The transfer of litigious credit is not among the contracts the execution of which must appear in public instrument to which § 1232 of the Civil Code (31 L.P.R.A. § 3453) refers. The transfer in these cases complies with the requirements of the aforesaid Rule 22.3, including that of service of notice on Tana-Ibec in this case. Tana-Ibec's consent was not necessary for transferring the aforesaid credit. *Morales* v. *Blanco*, 15 P.R.R. 222 (1909). These causes are assignable, for they are not personal rights such as, among others, use, habitation, patria potestas, support, tutorship, and testamentary will. *Robles* v. *Superior Court*, 85 P.R.R. 640 (1962). The effect of the

transfer in these cases has been the substitution of the original purchasers by others with respect to the same credit, the same obligation prevailing with all its accessory rights. Tana-Ibec is liable for the same obligation to these transferees so that the obligation does not change by reason of the transfer, neither in its nature nor in its extension, nor in its content. Of course, the exceptions inherent to the thing prevail, that is, the defenses available in cases like these, which appellant Tana-Ibec could have set up against the original purchasers. De Diego y Gutiérrez, Felipe Clemente, *Transmisión de las Obligaciones* 126 (1912). The actions in question could have continued in the name of the original purchasers as provided by the aforesaid Rule 22.3, despite the fact that they had sold the houses. *Méndez* v. *Bowie*, 118 F.2d 435 (1st Cir. 1941). Therefore, it cannot be argued, as Tana-Ibec claims, that upon selling the houses the actions brought by the original purchasers were extinguished so that their subsequent transfer in these cases becomes ineffective. The truth is that the substitution procedure in no way affects the substantive rights of the parties.

Although the case of *Zalduondo* v. *Iturregui*, 83 P.R.R. 1 (1961), dealt with the substitution of defendant as subsequent purchaser of a property subject to the real action for redemption since it was a joint interest, it is not less certain that according to the doctrine established therein, when in effect a right is transferred, the acquirer remains in the same position as his predecessor and therefore he benefits from the steps timely taken by the former owner, as well as from his rights and he remains subject to the same liabilities and defenses which could be claimed or invoked against the former.

In view of the foregoing, the hidden character which the defects or some of them could have in relation to the original purchasers subsists when the latter are substituted by the subsequent purchasers and it remains as a ground for the

action under § 1483 of the Civil Code. However, we conclude that the subsequent purchasers cannot make Tana-Ibec liable for moral damages caused by its negligence as builder since they could not have suffered them because they bought having knowledge of the claims already made by the original purchasers to Tana-Ibec and of the defects in construction on which the claims were based.

■ There is no merit in the defense that because of failure to fix a price to the transfer, Tana-Ibec could not exercise the right of redemption of the aforesaid litigious credits, pursuant to § 1425 of the Civil Code, because such right prescribed when it failed to exercise it by motion to that effect, within the term of nine days fixed by the aforesaid provision. In that motion they could have requested to be informed as to the price of the transfers and indicate their intention to pay said price after verification.

8—"The judgment is also erroneous insofar as it grants Enrique Díaz compensation against Tana and damages against Ibec despite the fact that said Enrique Díaz was not a plaintiff nor did he appear as a party in any of the consolidated cases."

Tana-Ibec is right. Although it is true that evidence was introduced at the hearings held in these cases with respect to the defects existing in the residence sold by Tana-Ibec to Enrique Díaz, and the same was inspected by the trial judge and was subject to additional specific findings of fact by the trial court, and said claimant was included in the list of claimants which the trial court made in its judgment, it is not less true that in the record there is not any complaint filed by this claimant against Tana-Ibec and that therefore the parties, as well as the trial court, committed error in consolidating the action of Enrique Díaz, since the same was never initiated. Rule No. 2 of the Rules of Civil Procedure.[8]

---

[8] Rule No. 2 provides that:
"An action is commenced by filing a complaint with the court."

9—"The judgment is also erroneous in not ordering Julia M. Benítez, whose claim was dismissed, to pay costs and attorney's fees."

■ The trial court did not indicate in its judgment the reason for dismissing the case of Julia M. Benítez. It is argued that it made this determination because the claimant did not establish that she was the owner of the house object of her action and that by virtue thereof it was mandatory to order her to pay costs and attorney's fees.

Rule 44.4(a)[9] of the Rules of Civil Procedure provides that costs shall be allowed to the prevailing party. Therefore, in an ordinary civil action such as this one, the imposition of costs is mandatory. *Peralta* v. *Peninsular Life Insurance Co.*, footnote 1, per curiam decision of June 4, 1964. So that the trial court erred in not imposing them. Therefore the judgment in this case should be modified in that sense. *Colón* v. *Asociación Cooperativa Lafayette*, 67 P.R.R. 250 (1947); *Feliciano* v. *Antonio Roig, Sucrs.*, 56 P.R.R. 689 (1940).

■ Rule 44.4(d) of the Rules of Civil Procedure provides that where a party has been obstinate, the court shall in its judgment impose on such person the payment of a sum for attorney's fees. The trial court did not make any specific pronouncement as to obstinacy, and therefore, in view of the circumstances of the case, the failure to impose the payment of attorney's fees did not constitute error.

10—"The judgment is also erroneous insofar as it orders both defendants, appellants herein, to pay the sum of $300 in each case for attorney's fees, that is, the total sum of $24,900."

In support of this assignment it is argued that Tana-Ibec was not obstinate in defending itself from these claims, because:

---

[9] Rule 44.4(a) provides:

"(a) *To whom awarded.* Costs shall be allowed to the prevailing party, with the exception of those cases in which by law or by these rules it is otherwise directed."

(a) The amount of such claims according to the complaint was five times the amount of the judgment which even reduced, is erroneous as excessive.

(b) Tana-Ibec was obstinately dragged into these suits despite having been always openly willing, before and after the filing of the complaints, to rescind the sales, or in default thereof, to make the necessary repairs and adjustments in the houses.

(c) The fees fixed are excessive because as a result of the consolidation of the cases, at the request of Tana-Ibec, there actually remained a single action, since the questions of law involved in the litigation are essentially common to all the cases. The questions of fact were reduced and limited by stipulations with respect to the evidence.

The first two grounds lack merit. In *Widow of Passalacqua* v. *Cancel*, 90 P.R.R. 490 (1964), we reiterated our previous decision in *Soto* v. *Lugo*, 76 P.R.R. 416 (1954). To that effect we stated that "the fact that a sum substantially lower than the amount sought in the complaint is awarded as damages does not show lack of obstinacy and we stated that a defendant who in his answer denies the allegation of negligence, thereby extending the duration of the suit and compelling plaintiff to proceed with the litigation and attendant expenses, inconveniences, and work, is obstinate and does not cease to be so because a few days before the hearing of the case he admits his liability and limits the controversy to the amount of the compensation." In these cases Tana-Ibec did not limit itself to litigate the amount of its liability but denied having contracted them; denied claimants the right to claim and alleged that if claimants had said right it had prescribed, and set up several other defenses. So that it is proper to conclude that there existed the required obstinacy and, therefore, the court was bound to impose on it the payment of a sum for attorney's fees. Rule 44.4 (d) of the Rules of Civil Procedure. *United States*

*Casualty Company* v. *Superior Court*, 89 P.R.R. 768 (1964);
*Ortiz* v. *Martorell*, 80 P.R.R. 525, 533 (1958); *Prado* v.
*Quiñones*, 78 P.R.R. 309 (1955); *Sucn. Trías* v. *P.R. Leaf
Tobacco Co.*, 59 P.R.R. 228 (1941); *Acha* v. *Nevares*, 59
P.R.R. 235, 247 (1941).

We conclude, however, that the award in question is
excessive and, therefore, it will be reduced to $200 in each
case. *Cf. Seda* v. *Miranda Hnos. & Co.*, 88 P.R.R. 344 (1963).

—B—

*Errors assigned by claimants*
*Appeal R-64-30*

Although the judgment favors them, the claimants appeal
before us alleging that the trial court committed three errors
which we consider below:

1. That the trial judge erred in granting only one built-up
roof for all the houses except two which already had it, when
it should have granted five additional ones.

Claimants contend that the trial court determined that
Tana-Ibec "always had reasonable doubt that the roofs would
leak"; that "they also knew that the roof they used in the
model house had leaked water"; and that "the defects in con-
struction in each and every one of the houses involved in this
litigation exceeded the measure of the imperfections usually
expected in a concrete construction"; that, therefore, the
rule established in *Géigel* v. *Mariani, supra*, should be applied
to these cases to the effect that "Defective construction im-
poses on the architect or contractor the obligation to correct
his negligence for the future by restoring to the building all
the qualities of a good construction"; that "for the future"
in a building means the remnant of the term of its useful
or normal life which in the case of these houses is 60 years,
according to the experts who testified; that the trial court

granted repairs for one sixth of the useful or normal life of the houses, since the aforesaid built-up roof is guaranteed for 10 years only.

It is not wise to assume that the rule established in *Géigel* v. *Mariani, supra,* to the effect that "Defective construction imposes on the architect or the contractor the obligation to correct his negligence for the future by restoring to the building all the qualities of a good construction" includes the obligation to maintain the roofs waterproof during all the useful life of the property, for it is a fact that property deteriorates by the mere lapse of time and by the current and ordinary use and therefore it requires upkeep and maintenance which, in the absence of an agreement to the contrary, it is the obligation of the owner.

The trial court was correct in imposing on Tana-Ibec the payment of a sum equal to the cost of the built-up roof in view of the evidence introduced on this question. It did not commit the error assigned since if it had awarded any additional amount it would have been extremely speculative. Moreover, in view of the term of prescription of 10 years fixed by § 1483 of the Civil Code for any claim of this nature, liability cannot be imposed on the contractor for the ruin which might occur after that term has elapsed.

2. That the trial court committed error in not awarding any item for moving expenses, furniture storage, and rental of dwelling for the time required by the repairs of the floors and elimination of cracks and stains of the ceiling and painting the repairs in ceilings and walls.

The evidence concerning the need to move out of the dwellings in question while the repairs of the vices or defects mentioned were carried out consisted of the testimony of claimants' expert, Mr. Martín. But this testimony was based on the theory that the defective roofs should be substituted by others of ordinary reinforced concrete. It is obvious from the findings of the trial court that the latter did not support

that theory, and on the contrary, concluded that the roofs in question could be repaired. Expert Martín admitted that the roofs were structurally well designed for the purposes to which they were to be devoted. The repairs in question, although undoubtedly will cause great inconvenience to claimants, do not require for their execution that claimants move out of their houses, because the repairs can be carried out by sections so that the houses continue being habitable.

We conclude, therefore, that the error in question was not committed.

3. That the trial court erred in not granting exemplary or punitive damages to claimants.

In support of this assignment the claimants cite the following findings of the trial judge:

"The model house which defendants constructed to attract potential purchasers of the houses which were to follow, justified plaintiffs [sic] to expect that something similar would be delivered to them according to the contract they signed.

"That the system of foam concrete and precast slabs for the roofs was used by defendants for the first time in the model house and water leaked but nothing in that respect was informed to plaintiffs."

They contend, moreover, citing the conclusions of law:[10]

"That defendants, with the results of the precast roof in the model house, *without introducing any change whatsoever in said roofs,* decided to continue using them for all the houses; and that

---

[10] The conclusions of law cited are the following:

"2. That defendants, with the results of the precast roof in the model house, without introducing any change whatsoever in said roofs, decided to continue using them for all the houses.

". . . . . . . .

"8. That defendant Ibec, although it is true that it acted negligently upon continuing the construction of the houses in this suit using the precast type of roof therein in spite of knowing that its use constituted a risk since it was an experiment which was not going to be satisfactory in view of the results obtained in the model house, did not act deceitfully or fraudulently in the construction of the houses in Highland Park Development."

Ibec acted negligently upon continuing the construction of the houses with this type of roof. . . *in spite of knowing that its use* constituted a risk since it was an experiment which was not going to be satisfactory in view of the results obtained in the model house . . . ." (Italics in the original.)

In the cases before us, we agree with the trial court that Tana-Ibec, although guilty of negligence in the construction, did not commit fraud. The evidence does not reveal the facts which in common law would justify the award of punitive damages. Therefore, we need not determine whether or not it is proper to award such damages. It is necessary to indicate, however, that in *Miguel* v. *Hernáiz Targa & Co.*, 51 P.R.R. 568 (1937), although reference was made to punitive damages, the award made was actually for the moral damages suffered consisting in the "shame and humiliation of being exposed to the public as persons capable of confabulating with others to commit a fraud." See Velázquez, *op. cit.*, *supra*, p. 120.

In view of the foregoing, the judgment is modified in these cases in the following points:

(1) The award against Tana in the claim *quanti minoris* is set aside.

(2) The judgment is limited to ordering appellant Tana-Ibec, as a single entity in its character as builder, to pay to claimants:[11]

(i) the amount specified in paragraph (a) of the judgment on that account and with the exception of the claimants indicated in said paragraph, that is, Julia M. Benítez, Fernando Barron, and José Ramón González.

---

[11] In determining the average amounts attributable to the dwellings not inspected we have not taken into consideration the case of Enrique Díaz because, as Tana-Ibec indicates, he never filed a complaint to assert his rights. Therefore, in spite of having considered him as one of the claimants, and of having inspected his house, in effect, as we have indi-

(ii) for the item indicated in paragraph (b) of the judgment, the amount of $225 for each one of the dwellings inspected by the trial judge, with the exception of claimant Leonard F. Partridge, who testified that in his house the doors and frames were in good condition, and of the claimant mentioned in said paragraph, that is, Julia M. Benítez. The amount of $215.43[12] to each one of the other claimants whose houses were not inspected by said judge, this being the average amount corresponding in these cases in accordance with what was stipulated by the parties.

(iii) for the item indicated in paragraph (c) of the judgment, $200 for each one of the dwellings inspected by the trial judge, excluding the claimants indicated in said paragraph, that is, Julia M. Benítez, Fernando Barron, and José Ramón González. The amount of $187.23[13] to each one of the other claimants whose houses were not inspected by said judge, this being the average amount corresponding in these cases in accordance with what was stipulated by the parties.

(iv) for the item indicated in paragraph (d) of the judgment, $750 for each one of the dwellings inspected by the trial judge excluding the claimant indicated in said paragraph,

---

cated, the judgment in this case is not extensive to him nor can it benefit him.

With reference to amounts, the paragraphs marked with letters from (a) to (f) are the ones marked with numbers 1 to 6 in Part II of this opinion.

[12] We obtained this amount by multiplying the amount awarded to the houses inspected by the number of claimants whose houses were inspected (except claimants Julia M. Benítez, Leonard Partridge, and Enrique Díaz) and dividing the result by the number of claimants whose houses were inspected (except Enrique Díaz), that is,

$$\$225 \times 45 \div 47 = \$215.43$$

[13] We obtained this amount by multiplying the amount awarded to the houses inspected by the number of claimants whose houses were inspected (except Julia M. Benítez, Enrique Díaz, Fernando Barron, and José Ramón González) and dividing the result by the number of claimants whose houses were inspected (except Enrique Díaz), that is,

$$\$200 \times 44 \div 47 = \$187.23$$

that is, Julia M. Benítez. The amount of $734.04[14] to each one of the other claimants whose houses were not inspected by said judge, this being the average amount corresponding in these cases in accordance with what was stipulated by the parties.

(v) for the item indicated in paragraph (e) of the judgment, the amount of $250 for each one of the dwellings inspected by the trial judge, Acapulco type, with the exception of those belonging to claimants Graciany Miranda Marchand, Robert Ruby, Milton Heath, Salvador Hernández Oviedo, and Germán Sigurany. The amount of $193.18[15] to each one of the other claimants whose houses are of Acapulco type and were not inspected by said judge, this being the average amount corresponding in these cases in accordance with what was stipulated by the parties.

For the item indicated in paragraph (e) of the judgment, the amount of $325 for each one of the dwellings inspected by the trial judge, Montecarlo type, with the exception of the claimants Félix Matos and Julia M. Benítez. The amount of $299[16] to each one of the other claimants whose houses are of

---

[14] We obtained this amount by multiplying the amount awarded to the houses inspected by the number of claimants whose houses were inspected (except Julia M. Benítez and Enrique Díaz) and dividing the result by the number of claimants whose houses were inspected (except Enrique Díaz), that is,

$$\$750 \times 46 \div 47 = \$734.04$$

[15] We obtained this amount by multiplying the amount awarded to the houses inspected, Acapulco type, by the number of claimants, owners of houses of the type Acapulco which were inspected (except claimants Graciany Miranda Marchand, Robert Ruby, Milton Heath, Salvador Hernández Oviedo, and Germán Sigurany) and dividing the result by the number of claimants, owners of houses Acapulco type which were inspected, that is,

$$\$250 \times 17 \div 22 = \$193.18$$

[16] We obtained this amount by multiplying the amount awarded to the houses inspected, Montecarlo type, by the number of claimants, owners of houses of Montecarlo type which were inspected (except claimants Félix Matos, Julia M. Benítez, and Enrique Díaz) and dividing the

Montecarlo type and were not inspected by said judge, this being the average amount corresponding to these houses in accordance with what was stipulated by the parties, with the exception of Genaro Báez, Juan A. Gómez, Miguelina Ayala, Mario Rocher, and Julia Carmen Marchand, exception not established by the trial court but which the claimants did not challenge in their petition for review.

(vi) the amounts specified for damages according to the next to last paragraph of the judgment in this case, except in the cases of Robert E. Trent, Luis González Quiñones, Germán Sigurany, José A. Rivera, Ernesto Reyes Arnaldi, José Castellano Lloréns, Manuel A. Fernández, José Ramón González, and Fernando Barron who, since they were subsequent purchasers, could not suffer such damages.

(3) Costs are imposed on defeated party in action No. 66(a) of the case No. 61-5569 who was Julia M. Benítez.

### *Certiorari C-64-24*

In this petition the award of costs and expenses of claimants amounting to $7,810 is challenged.

The situation of facts with respect to this question is the following:

On December 20, 1963 the claimants filed a memorandum of costs and expenses requesting $7,300 for costs and expenses, broken down into two items, one for the services rendered by engineer Martín and the firm, Sacmag of Puerto Rico, Inc., for $5,615.30, and the other for expenses due to summons, stamps, notices, photocopies, depositions, etc., for $1,684.70. On December 24, 1963 (four days later) Tana-Ibec filed a motion requesting the claimants to specify "all the items for expenses and disbursements incurred in the

---

result by the number of owners of houses Montecarlo type which were inspected (except Enrique Díaz), that is,

$$\$325 \times 23 \div 25 = \$299$$

litigation" and that a term of ten days be granted to them counted from the receipt of that list in order to challenge the memorandum of costs and disbursements.

After a hearing, the court so ordered and on January 23, 1964 the claimants filed a memorandum of costs, expenses, and disbursements wherein the costs and disbursements were set forth in different items, specifying more in detail the second item.

The 30th of that same month, Tana-Ibec filed a motion challenging the memorandum of costs, objecting, with the exception of the fees for stamps, to all the items: some for improper, others for excessive, and others for lack of necessary specifications in order to judge them. The item paid to Sacmag of Puerto Rico, Inc., was challenged because "in addition to being excessive, said payment is illegal."

On February 7, 1964, some minutes before the commencement of the hearing on the memorandum of costs, the claimants filed a motion requesting permission to amend the memorandum of costs and in effect to file the memorandum of costs and expenses. At this hearing only counsel for the parties appeared to argue their respective points of view, and no evidence of any kind was presented.

On March 12, 1964 the respondent judge entered an order approving the memorandum of costs in its entirety, including the supplemental memorandum.

Tana-Ibec alleges that the trial court committed error in approving and awarding the totality of the costs and expenses included in the memorandum of costs filed by claimants on the following grounds:

(1) That it was neither stated nor proved that the disbursements listed in the memorandum of costs were necessary and, therefore they are improper in the light of Rule No. 44.4 (b) of the Rules of Civil Procedure.

76

(2) That the different items are improper, excessive and untenable and were not identified, verified, nor supported by any kind of evidence.

(3) That the item "payment made to Sacmag of Puerto Rico, Inc." of $5,615.30 for expert counseling is, in addition, illegal since it is a compensation to a corporation for engineering professional services.

(4) That the supplemental memorandum of costs and expenses filed on February 7, 1964 was untimely filed.

■ Ordinary expenses of the offices of claimants' counsel such as postage stamps, office material, and transportation of counsel during an inspection may not be included as costs. Expenses for transcript of records of the hearings are also not includable as costs when such transcripts are requested because they are convenient but not necessary for claimants. *Farmer* v. *Arabian American Oil Co.*, 379 U.S. 227, 233 (1964).

■ The expense incurred in obtaining depositions is recoverable if they are necessary even if they are not used at the hearings of the case. *Hope Basket Co.* v. *Product Advancement Corp.*, 104 F.Supp. 444 (D.W.D. Mich. 1952).

In *Garriga, Jr.* v. *Superior Court*, 88 P.R.R. 237 (1963), we held with respect to costs in a trial, that:

"(1) . . . . . . . .

"(2) Trial courts must exercise such discretion liberally and shall examine carefully the memoranda of costs in each case, particularly when the costs claimed are challenged.

"(3) The costs contemplated in Rule 44.4 are expenses (a) necessary, (b) incurred, and (c) reasonable. Their reasonableness shall be determined in accordance with the economic reality of Puerto Rico, and as to the personal expenses, the economic condition of the persons involved (witnesses and litigants) shall also be borne in mind. No unnecessary, superfluous or extravagant expenses shall be allowed."

It seems to us that in the light of this doctrine, when the necessity and reasonableness of the different items of costs and disbursements were challenged, the claimants should have produced evidence justifying such need and reasonableness. Neither from the face of the memorandums of costs, expenses, and disbursements nor from the record of the case does it appear that the different items were proper charges by reason of their need or that the amounts were reasonable, with the exception of the following items:

1. (a) Summons, returns, and notices — $96
 (b) Cancellation of stamps — $45

These items have not been objected to by Tana-Ibec.

2. Services rendered by engineer Ignacio Martín and the firm Sacmag of Puerto Rico, Inc. $5,615.30

As to the payment made to the corporation Sacmag of Puerto Rico, Inc., we know that in the original memorandum of costs an item of $5,615.30 was included as paid for "services rendered by engineer Ignacio Martín and by the firm Sacmag of Puerto Rico, Inc." In the second memorandum of costs filed for the purpose of distinguishing the items included in the first one, Ignacio Martín was not mentioned. The evidence shows that Martín carried out all the engineering professional work in relation to the determination of the defects in construction in claimants' dwellings and with respect to the nature, extent, and means of correcting the same. He prepared a report in detail in which he gathered and compiled all the data and estimates, result of his studies on each building. In these activities he obtained help in clerical work, which it is assumed was furnished by the corporation in question. Engineer Martín testified at great length and in detail on the aforesaid studies and he was, further, extensively cross-examined by defendants' counsel.

■ It can be concluded that the item concerning engineering services covers the professional services of engineer Martín and the clerical work in relation thereto incurred by Sacmag of Puerto Rico, Inc., which were all paid to the latter. We conclude, further, that the amount paid for such services is fair and reasonable. Although it is possible that the payment to Sacmag of Puerto Rico, Inc., for professional engineering services could have been objected to originally pursuant to our doctrine in *Rasa Eng. Corp.* v. *Daubón*, 86 P.R.R. 182 (1962), the item corresponding to the reimbursement of this payment is not by itself illegal so that its challenge for the reason indicated is inappropriate, since the relation of the possible illegality with the reimbursement requested is indirect and collateral. *Sánchez* v. *Coll*, 69 P.R.R. 863, 867 (1949).

There remains to be considered the question of whether the supplemental memorandum was timely filed. On February 7, 1964 claimants filed the supplemental memorandum of costs in order to include three items which, because of inadvertence, were not included in the memorandum of December 20, 1963, which was later remade on January 23, 1964 and filed setting forth in detail the second item thereof.

In order to decide this question we have to answer the following questions:

1. Were those expenses which were listed in the supplemental memorandum incurred at the time the copy of the notice of judgment was filed in the record?

2. Do the additional findings affect the items listed in the supplemental memorandum?

3. Is the "notice of judgment" of January 31, 1964 actually a "notice of judgment"?

From a study of the supplemental memorandum we reach the conclusion that the items specified therein, if they had been necessary and reasonable (since on that point we

do not have, with respect to some items, evidence to determine) were so at the time of filing the notice of judgment in the record on December 16, 1963.

The additional findings of fact made by the trial judge do not affect or in any way concern the items listed in the supplemental memorandum.

█ If we assume that the notice of January 31, 1964 is a "notice of judgment" we would reach the conclusion that the memorandum of costs of February 7, 1964 was timely filed. But such "judgment" is only an *order* of the trial judge on a *motion* of Tana-Ibec requesting additional findings of fact.

█ It is obvious that this supplemental memorandum was filed after the term of 10 days had elapsed from the time copy of the notice of judgment was filed in the record as prescribed by Rule 44.4 (b) of the Rules of Civil Procedure. In this case the point of departure in order to determine whether the memorandum of costs was filed within the aforesaid term was December 16, 1963, date on which copy of the notice of the judgment was filed in the record in these cases.

█ Said term of 10 days *cannot* be extended, pursuant to the provisions of Rule 68.2 of the same body of Rules as this rule was amended on January 24, 1961, effective on July 31, 1961. Therefore, it was inappropriate to consider the aforesaid supplemental memorandum and to approve the costs included therein.

In view of the foregoing, we approve only the two items not objected to and the item of $5,615.30 paid to Sacmag of Puerto Rico, Inc., for the services rendered by engineer Ignacio Martín and the aforesaid firm. The other items are disallowed some for improper, others for having been untimely filed, and the rest because the need or reasonableness of their amount was not justified. For those purposes the order of the trial court of March 12, 1964 is modified.

· .Mr. Chief· Justice as well as Mr. Justice Belaval and .Mr. Justice Blanco Lugo did not participate herein.

—O—

ON MOTION FOR RECONSIDERATION

MR. JUSTICE DÁVILA delivered the opinion of the Court

San Juan, Puerto Rico, April 26, 1968

All the parties involved in this suit, including the amicus curiae have filed motions for reconsideration. They do not lie, but we consider it necessary to set forth some views for the purpose of disposing of two grounds adduced in favor of the reconsideration: (1) impropriety of moral damages in this kind of action and (2) nonconformity with the definition of what constitutes "vice of construction" under § ·1483 of the Civil Code set forth in *Géigel* v. *Mariani*, 85 ˙P.R.R. 43 (1962).

■ It is alleged that the granting of moral damages resulting from the violation or noncompliance with a contract is a minority position in the civil law doctrine. Once more we reiterate that in adopting a rule or doctrine this Court is not moved by the fact that the rule has greater or less acceptance but the controlling test must be that such doctrine is adaptable to our law in force, and that it is, in turn, the most appropriate and convenient solution for our economic, social and cultural reality. But, aside from that, the truth is that the doctrine we have adopted is being accepted by eminent authorities on civil law as it is shown by our citations in the opinion rendered in the present case. *Ante*, pp. 57–58.

■ Now then, it is fitting to state that when granting compensation for moral damages in this kind of actions the judges should carefully consider the same, limiting it .to those cases in which the conditions of the construction have

appreciably affected the emotional conditions of the claimant. Not every defect of construction which binds the constructor to repair entails the granting of moral damages. The defects must be of such a nature as to affect the psychic condition of a person.

■ Appellants allege that the rule established in the case of *Géigel* v. *Mariani*, in relation to what constitutes a defect of construction, is the result of an erroneous interpretation of the remarks of Colin and Capitant on said section. They maintain that said authors referred to § 2270[17] of the French Civil Code (which has no equivalent in our law) and not to § 1792,[18] which is equivalent to our § 1483. Colin and Capitant, 4 *Derecho Civil* 497 (1955 ed.), referring to what "defective construction" means, state:

"It is necessary to know what must be understood by defective construction.

"The opinion most favorable to architects and contractors, which was given by the State Counsel (Cons. de Est., May 18, 1888, D.P.89 5.299), only comprises as defective construction the vices which might affect the solidity of the building, and, naturally, the vices not affecting the solidity, such as inferior quality tiles and roofing lead, ill fitted windows, use of salt-petrous stones, etc. . . . are covered with the receipt. . . .

"On our part we believe that it is better to consider, as the civil jurisdictions do, that the builder's liability generally comprises, *all such kinds of vices* that exceed the measure of imperfections expected in a construction. . . ." (Italics ours.)

■ Evidently they are referring to the vices of construction of § 1792 of the French Civil Code, especially when it has been determined that vices of construction means de-

---

[17] Section 2270 of the French Civil Code:

"After ten years architects and contractors are discharged from the warranty of workmanship performed or directed by them by estimate."

[18] Section 1792:

"If the edifice, built at a set price, perish in whole or in part by defect in its construction, even by defect in the foundation, the architect and the contractor are responsible therefor for ten years."

fects of construction. (*Géigel* v. *Mariani*, at p. 46.) In relation to the alleged great difference between § 1792 and § 2270 of the French Civil Code, Laurent, *Derecho Civil Francés* 30–56 (1900 ed.), sets forth the majority opinion of the French authors on said sections, which is contrary to appellants' contention. In this respect he states:

"We come to a very difficult and highly controversial question. Section 1792 holds the architect liable for the total or partial loss of the edifice when it perishes by defects in its construction and even by defects in the foundation, and, pursuant to § 2270 the architect is warrantor of the workmanship directed by him. Do these two sections establish the one and same liability, or do they provide for different cases which are governed by different principles? The authors generally point out that § 2270 complemented the provision of § 1792, extending to all the others, the liability which § 1792 seemed to limit to the construction of edifices built at a set price.

". . . . . . . .

"*In theory we prefer the opinion set forth by the majority of the authors*. The architect's liability is one, and not manifold; it derives from the same cause, from the diligence he promises to exercise in the execution of his obligations; it is the care of a good father of a family which any debtor must have, a care which is specialized by reason of the specialized nature of the work, in this sense: the architect must exercise all the care of a good architect; he is liable when he does not comply with said obligation. . . .

". . . both sections have solely one and the same objective, that of determining the time during which the architect is liable for the defects of construction and of the ground, after the works have been examined and received; the identity of the term implied the identity of both provisions. . . .

". . . The works performed by estimate of § 2270 are consequently included in the construction works of § 1792, it is the one and same work, except that § 1792 refers to the total construction of the building while § 2270 comprises the partial works. Since the nature of the work is the same, the principle involved must be the same. What is it about? It is a question of whether the works are of such a nature that the owner

cannot supervise them when receiving them in the sense: that it is difficult or impossible for him to discover its defects; and it is quite evident that said difficulty or impossibility is the same when the works are partial or when they embrace the whole building. In any event they are works which must guarantee the solidity of the building: the owner cannot ascertain such solidity unless the works are maintained for a certain length of time fixed by the law, ten years. *It follows therefrom that §§ 1792 and 2270 provide for the same kind of works, and it would be strange, unexplainable, that the law establish different principles for identical works.*" (Italics ours.)

 Thus, we do not see any justification to modify the rule adopted in *Géigel* v. *Mariani,* to the effect "that the liability of the builder generally comprises all such types of vices as exceed the measure of the imperfections usually expected in a construction work. 4 Colin and Capitant, *Curso Elemental de Derecho Civil* 349 (1925 ed.)."

The motion for reconsideration will be denied.

Mr. Chief Justice Negrón Fernández and Mr. Justice Blanco Lugo did not participate herein.